Next case on the docket is 5-60-0141 Nisar Lakho v. Abbott Nisar et al. Mr. Shoemaker, you may proceed when you're ready, sir. Is it easier for you to sit, Mr. Shoemaker? I'll be fine. If you at any time decide that you need to, please let us know. Thank you very much. I appreciate the courtesy. May it please the Court. And with counsel present, I apologize. Don't charge them time on this. Did you hear when I indicated Justice Chapman is not going to be a representative? Yes, Your Honor. Okay. All right. Thank you. Mr. Shoemaker, you may continue. May it please the Court. I'm Don Shoemaker, and I have the privilege of representing Robert Nisar Lakho in this matter. One thing I would emphasize from the start is there are two slightly different operative facts that the Court has to deal with here. There is Pyramid Investment Management Company 1 and Pyramid Investment Management Company No. 2. They have overlapping fact patterns but are two different deals. And that's very important because as to Pyramid Investment Management 1, I for the life of me cannot understand why I'm standing in front of it. Why you what? I cannot understand why I'm standing in front of it. There is no arbitration agreement whatsoever between Nisar Lakho and Pyramid Investment Management 1 or the other investors regarding Pyramid Investment Management 1. It's my understanding that when your client gave the money for what I'll call 1, that his name was not listed as a member on the operating agreement, but the operating agreement contained an arbitration clause. Is that true? It's my understanding that it did, Your Honor. It contained an arbitration clause. I think it did. But your client was not identified as a member when he gave the money. That's correct, and he wasn't given that document when he gave the money. Okay, but that agreement was amended. Two years later, his name for the first time ever was put on that document, but he never signed it. Let me make sure I understand the facts correctly. Everyone would agree, I think, that he never signed PIM 1. I agree with that. There's an issue about whether he received a copy of it. There's no issue about whether he ever signed it. No one has produced a signed copy of PIM 1 that your client signed. Correct. Okay. PIM 2 he did sign, but after he gave the money. Well, well after he gave them the money. Wait, wait, wait. PIM 2 you're talking about? Yes, PIM 2 he did sign. This is your typical – I feel like I'm dealing with a broken bridge here. Dr. Alito has these friends who come to him, and they're not registered security brokers. And they say, hey, I want to sell you some investment. What's the investment? I'm going to buy land in Florida during the economic crisis. Not to mention the unfortunate choice of name of Pyramid Investment. But anyway. You want to respond to the lawyers and comment on that? But anyway. So I want you to get in on the ground floor of this deal. How much is it going to cost? $100,000. I don't know. I don't know if I want to tie this money up. I've got kids who are going to be college-age in a couple years. Don't worry about it, he's told. We'll pay you back 8% on your investment if you decide to bail on us before we sell it. Okay. They never register the securities? They never notify the State of Illinois that they're selling the securities to the State of Illinois? Mr. Shoemaker, what makes you think that these are really securities as opposed to an interest in an LLC that's a unit? What's the difference here? Because they went around to different people in the State of Illinois and offered an investment opportunity to individuals who have absolutely no control over this investment opportunity. The defendant argues, well, they're all friends and buddies and they're running this together. But if you look at the operating agreement, the only people who have any control whatsoever over what happens with this company are the managing members. But in Illinois, you can have a managing member LLC and you can still be a member of the LLC who owns certain units. It's not a security in Illinois, right? I don't agree with the court with all due respect. I believe you can't have LLCs where you're selling interest in them. They refer to these as shares and interest in the transaction documents. And what occurred here? But you can't sell a share, like a corporate share, in an LLC. I would agree with you. However, they're listed as percentage ownerships throughout all the documents. But what they did here was, before they approached Dr. Laco, the documentation shows they had already sold 100% of Pyramid One. And somehow, without giving him any documentation showing him, there are sales transaction agreements between these individuals and Laco transferring portions of their investment in Pyramid to him, which were never signed by anyone, but they exist. There is absolutely no documentation showing how Dr. Laco received his interest in Pyramid One. Let's assume, just for the sake of argument, that there is a valid arbitration clause, at least as to the second, number two. Okay. Let's just assume that. Wouldn't the question of whether or not these are securities go to the arbitrator? I don't think they would. And the reason I don't think they would is there's two issues. Number one, I think the language of the arbitration clause doesn't include this transaction. Okay. These, the, firstly, the document is signed and given to Dr. Laco months after he's given them the money. I'm just making the assumption. I understand you don't believe that. I'll assume that. If you look at the Estes case, Catherine G. Estes v. Metropolitan Life Insurance Company, I think that this is a decision that the trial court should have made. The trial court should have said, okay, Mr. Shuman, you're alleging that this company is violating the Illinois security clause, and you have a contract with them that contains an arbitration clause. And I'm going to assume for a moment that that arbitration clause is valid. Is the fact that they have failed to abide by the law in failing to register these and failing to be registered salespeople of securities in the state of Illinois, is that fact, does that void that arbitration clause? That's something the trial court, in my opinion, was mandated to do by this Estes case. But in that case, they actually were talking about securities. It was MetLife Securities, Inc., and they were selling shares very much like a securities law. Here, do you think the fact that it was an LLC is a distinction or a distinction without a difference? I think it's a distinction without a difference because you're dealing with the purpose of the law. The purpose of the law here is to protect people from being bamboozled. Well, don't you have an action of fraud then? That's what I thought. Right, but it could be pursued under the arbitration agreement, the same action. But should my client, I think this is part of the ongoing scam, quite frankly. You've got all these people who all live and all work within 30 miles of St. Louis. This dispute has absolutely nothing to do with Florida. Well, it's Florida property. Well, but it has nothing to do with Florida properties at all. I don't even know whether they actually used his money to invest in the property or not. It has to do with what they told him in order to get him to hand them the checks. That's what this has to do with. And whether that constitutes fraud and a violation of the Illinois securities laws. You can agree that we can agree perhaps that fraud and a violation of the securities law could be two separate things. I totally agree. But I think that when we're talking about whether the arbitration clause is valid, assume it is, that this case clearly says if a party is prohibited from doing an act because of its failure to comply with licensing, registration, or similar requirements, it essentially voids the contract. But in the Asti case, the entire environment, even the arbitration clause, said you're going to follow the rules of the National Security Act or whatever it was. National Association of Securities Dealers. So it didn't seem that there was real issue as to whether these were securities or not. Well, but that's why I think the trial court should have allowed me to conduct the appropriate discovery to determine whether these were or not securities. So now you think it was a question of fact at least as to whether, which goes back to my issue, that is that the role of the arbitrator to determine? I think if you're in law, it's the role of the court to determine that issue before they pass off something this important to an arbitrator, especially if I have to go 1,000 miles to pursue a fraud case where everybody, every single individual is here. Under the arbitration clause, though, did you have to go that far or is just that the controlling thought? No, it says we have to go to Florida to do this. I mean, not only did they, I mean, I'm not still arguing if it's valid, okay, but the court in their ruling clearly, they were required to look at all the clues and supporting documentation in the light most favorable to me. And he did the exact opposite. He moved everything in the light most favorable to the fraudster. And I just simply cannot understand how we're here. I see now you're saying the principal place of business is western Florida and the agreement said it had to be at the AAA office as opposed to that. Yes, and it's my position that they included that requirement to make it so heinous upon the people that they were going out and selling these shares for, these interests for, that you can't afford to pursue the cause of action. And did you put all that into the record, the cost and the burden? Yes, well, we argued it. I mean, nobody did research, but it's not hard, I don't think, to say common sense dictates that if I have an arbitration in Belvoir or St. Louis and everybody's here, it's going to be a lot cheaper than doing it down in western Florida. Was it raised in the pleadings? Yes. Oh, absolutely. Okay. I mean, all this was raised in Florida.  Yes, ma'am. Yes, ma'am. Your fundamental argument, as I understand it, though, is the arbitration clause provides that arbitration is required for any controversy or claim arising out of or relating to this operating agreement or to the interpretation, breach, or enforcement thereof. And your main argument is that this controversy or claim does not relate to the operating agreement, does not arise out of it, that this was all set. For one thing, your client never even signed it on 10-1. But these are claims that do not arise out of the agreement. It's fraud and securities. They have nothing to do with it. Is that your main argument? Yes, sir. Okay. I'm not attacking any way, shape, or form the way they were able to come. Right. At all. It didn't matter if the money was to buy cattle, gold, silver, did anything do it? The issue is, does he get it back with 8% if he asks for it? That's right. Okay. I mean, there's a full host of reasons why this doesn't work. Get back to my presentation. The overarching one is the language doesn't apply. The arbitration wasn't even in existence when he turned over these checks. He didn't even have an opportunity to know what he would sign up for when he turned over these checks. And then they send him the one eight, nine months later on PIN 2. There is never any PIN 1 agreement. So I cannot justify or understand in any way why we're here on that. Because my reading of arbitration law is you have to be absolutely sure that this is what you're signing for and you're signing on to arbitrate something. And this argument that somehow the statute of fraud applies, I don't even begin to understand that. What about the Wiggington versus Dell case where he got his arbitration agreement in the box after he boarded the computer? I had the same reaction. You know, it's like these ULAs, these companies put in the software. I get that. I mean, paragraph 49C, subparagraph 3. You know, and that's kind of what they did. They buried this, you know, in this operating agreement. Well, that's all getting to an unconscionability argument, though, right? Well, I'm not arguing that, but I'm arguing whether my client should be held to an arbitration clause that, first of all, seems to me to be prospective. Okay. Not up to this time that covers everything having to do with you and any other member, but arising out of, to me, indicates from the day you sign on forward, even in the best reading of the document. Well, your argument is there has to be an arbitration agreement, and there wasn't any on PIM 1. That's right. There wasn't one on PIM 2. I mean, the guy with the Dell computer, he could have opened it up, read it, packaged it back up, and shipped it off. And he had it back to him. And sent it back to him, but here the money was gone, and when your client asked for his money back, he didn't get it. That's right, and that's him, too. Right. You know, he buys the computer, opens it up. There's no paperwork inside. He turns it on. There's no ULA. You know, it isn't until eight months later that somebody comes and says, you know, that computer you bought, by the way, is subject to this arbitration agreement. Sign it here. Well, what if I don't sign? Well, we're not going to give you your money back. So, you know, he's putting a box there and trapped, and he's got $150,000 invested here with a company that won't even respond to his demands. That won't even let him play a role because he's not a managing member under their operating room who are the people who make all the decisions. Did he ask for his money back before he got this copy of PIM-2? No. No, he did not. You know? At what point in time did he ask for his money back on what we're calling PIM-2, P-I-M, Roman numeral 2, for the record? I would have to look at the complaint. I apologize. Did he participate in this for some period of time? Participation means going to meetings and have people tell him how the company was doing. Right. He did that. That was my understanding. If participating men sent emails saying, I don't understand what you're doing, he did some of that. But, no, he was involved with the company even after he got this operating agreement. It was number two, I'm sure. He interacted with the company after he got the PIM-2. There's no doubt about that. I agree with that. But we're not here to determine anything about the truth or falsity of any allegations. The only issue before us is who decides it. That's right. The court or the arbitrator. That's right. And I can be sure all he decided in light was strictly with me. And, clearly, that was not done here. I mean, I look forward to him going to court and I'll be talking about PIM-1. Well, there's two issues. Two issues, right? One, was there an agreement to arbitrate? That's right. And even if it was, did this particular issue that you've raised arise out of using the language of the arbitrator? Correct. So the first, there's really two issues, right? Right. And then even if it does apply, there's the third issue of, is the court's role to make that determination given the gravity of what's alleged here and the harm to Illinois citizens? Or are we going to pass that off to arbitrators? And I think the court should carry that burden for Illinois taxpayers. That's the whole purpose of the statute. But that's only if the arbitration clause applies. That is only if the arbitration clause applies. Any other questions, Your Honor? I appreciate your time this morning. Thank you. Okay. Sorry, I was writing. You may proceed. Thank you, Your Honor. May I please be recorded? Counsel. Mr. Kleindorfer? Kleindorfer, yes. Could you just state your name for the record, please? I am Jason Kleindorfer, and I represent the entirety of the defendants' office. Great report. This is the time I'm reading them all. This is, I think, becoming more of a complicated issue than it really was before the court appeared today. What we're here to decide and what the notice of appeal says is essentially whether or not what Judge McGlynn did was proper in referring it for arbitration. That's somewhat an opposite to the issue statement contained in the plaintiff's brief, which seems to limit the case to the Illinois Securities Act claims. As you know, there's essentially two sets of claims here, a set of fraud claims and a set of Securities Act claims. So there's been argument, it seems like, on both, and I want to make sure the defense doesn't forfeit our argument if we're going to go forward also to argue those fraud claims. Do as you see fit here. Sure. We're not waiving anything. Your briefs are here. Right. So essentially, in looking at this case, you have to sort of see what Judge McGlynn had access to, what information, what evidence, what the law was. And when he heard the motion to compel the arbitration, he had essentially uncontroverted evidence provided by the defense in the form of two sworn affidavits. That's the uncontroverted evidence in this case. He had a check for PIM 1 in the amount of $100,000, which is attached as our Exhibit A to our brief. The memo lying on the check says it's for PIM 1. He had the affidavit of Abid Nassar, who was a managing member at the time doing the affidavit, who gave some statements regarding PIM 1 and PIM 2, namely that the plaintiff was provided with the operating agreements for both PIM 1 and PIM 2 while in an attorney's office in Clayton. Okay. Let me stop you there and ask you, do you agree that the plaintiff never signed PIM 1? To our knowledge, the evidence shows that he never signed it. Okay. No one's produced a signed copy anyway. How do you hold somebody to an arbitration agreement that they never signed and entered into? Well, I think you look at the circumstances here. So in early 2010, he gets the operating agreement allegedly, which is uncontroverted for the record, and then issues a $100,000 check for what's essentially a land transaction in an LLC. Then later in the same year, he gets another operating agreement for PIM 2 and signs it. So to say that – Is that ratification? I think it is, Judge. I think you take into account the check itself, savings for PIM 1, the knowledge of what's in PIM 2. I think as a whole, when you look at it, it's – and I think this is what Judge McWilliam, in fact, said. You can't expect us to believe that you issued a $100,000 check for a land transaction with – no. Why not? I'm sorry. Why not if you're among friends? Because it's a $100,000 check. Yeah, but if you're wealthy and you have trust in somebody, why not? Sure, and I understand that, but I think the counter – I mean, I don't understand why not. Okay. I think the counter to that is then you do get – we know that he got PIM 2. We know that he signed it. The uncontroverted testimony is able to hold him to an attorney. So if there was a problem with those provisions, certainly that was the time to raise it. Well, you talk about your affidavits. They filed a verified complaint. Yes, Your Honor. Which also gives them some – the fact that the allegations have been verified under our rules allows us to take those facts as true, correct? Right. You haven't filed a responsive plea into that complaint? No, because we would have motions to dismiss it. Right. So the only thing you filed was the two affidavits in response. In the motions, right. But the motions weren't verified, were they? Not to my knowledge. Right. If you look at those allegations in the complaint, there is no statement that says plaintiff did not receive a copy of the operating agreement, either for PIM 1 or PIM 2. It doesn't – Well, PIM 2 we all agree he signed. Sure. PIM 1, though, as Justice Stewart said, how do you agree to something you've never signed and there's no proof that he received or saw? Well, I think if you look at the affidavits – I mean, if you read the complaint and the affidavits together, there's not a whole lot that's really an opposite. I mean, we're all agreeing on the same basic set of operative facts. What we've got in addition is that he had a chance to review the operating agreement with an attorney, and he issued the check. He signed the check, and he put all the memo on it, and that was PIM 1. So I think you can at least take the circumstances and build that into that contractual relationship. Let me back up and make sure I understand what you're saying. Sure. The affidavit says that on PIM 1 he had a copy of it and reviewed it with an attorney? Yes, Your Honor. And then issued the check on PIM 1. Right. Okay. And for the record, the first affidavit is Mr. Nassar. He gives his testimony about PIM 1 and PIM 2. The second affidavit, I believe, just covers PIM 2. But ultimately, in reading the complaint and reading what the judge had in front of him in making this decision, it seems fairly obvious that the parties agreed to this. They knew that there was, whether it's constructive knowledge or actual knowledge, that there was this arbitration agreement that was going to control in 2010. When you give somebody $100,000 for an interest in an LLC, they're entitled then to a unit or some kind of, and I use the word loosely, share of that LLC, correct? Yes. And it's my understanding that when the $100,000 was tendered, his name was not immediately put into the LLC as a member. There was an amendment that was filed, I believe, or dated in 2013. Which was how many years later? Two or three years. Two or three years. Roughly. And so what is to say that that wasn't a loan or some other type of investment as opposed to an ownership interest? Is that clarified in the record now? Well, I think that that's going to be a circumstantial issue. That's my point, is you don't have his name on the operating agreement until two years later. You have $100,000 that's been given. So, as Mr. Shoemaker says, why does it rise out of the operating agreement for someone whose name isn't even put on it in exchange for the money? Well, we go back to the fact that you've got the $100,000 check that lists PI and 1. Sure. But does it say ownership interest? Does it say loan? Does it say anything other than M1? No, but when you read the plaintiff's complaint with what he says, he's saying that he bought the interest. We're saying that he bought the interest. Right. We've all got that as an agreement. There's no argument on whether or not it was for a different purpose. Well, he intended to buy the interest. Okay. But whether or not he truly did is part of this whole fraudulent scheme or issue or allegation, right? I suppose that that argument, I guess, is being made by the court, but I don't see that there's – I think the argument is what he allegedly was promised in return for that. That's my point. I'm sorry. Maybe I wasn't clear. What was the promise? Was it ownership interest? I don't know. That's my question. Sure. Isn't that in dispute? Well, I think it's the return on the investment. Is it the 8% only? That's what the plaintiff's complaint is. But, again, that same year he signs another operating agreement for PIM 2 that contains substantially the same. If you look at the terms of the agreement itself, Florida choice of law and an arbitration agreement. And I think that brings me to a point I need to address. Florida is just not a random forum that we've selected. Florida is – these corporations are Florida LLCs. They, as I stated, also have Florida law that they wanted as the choice of law that was agreed to. And the properties that were bought, the condominiums that were invested in, were in Florida. Truly, Florida has more contact with this case than Illinois does. Well, and I think having a Florida license, I can at one time, I can say that there's certain condominium laws that probably require this. Sure. And just to our perspective, it makes more sense to have a Florida LLC with Florida properties governed by Florida law in Florida. And that was bargained for. It was ratified by the plaintiff on PIM 2. And I think we keep going back to whether or not we need to separate PIM 1 and PIM 2. Talk to me about why this is not a security. Sure. Why doesn't this fall within the Illinois security standards? So securities are designed to, as I'm sure the Court is aware, protect the non-participating investor, someone that doesn't know what's going on, doesn't have the ability to vote. But if you look at PIM 2 in this case, the plaintiff had voting rights. He had exactly, explicitly what his profits were going to be as far as a return when the corporation went through all of that stuff. Well, all shareholders have the right to vote, a share. Right. Usually, I mean, even in a corporate setting. Why doesn't the case that Mr. Schumacher argues apply here? As far as the case you mean? Asti. Asti? Yes, sir. I think Asti doesn't apply because in that specific case the Court found that the arbitration agreement that was being brought before it was the only real contractual provision that was contained in the agreement. I think that it was a sort of a deal where there was an advertisement for it, they were sort of shopping for people to purchase securities. I mean, that's ultimately the difference is that there were securities. This case has an actual contract. Okay, but what is the difference? I mean, I don't think you've clarified for me, at least in my own mind, why their argument that this is a security fails. Well, I think it fails because in this case he is simply a member of an enterprise who is pooling his money with other people with the ability to participate, to vote, to know what's going on, as opposed to being the person that the Illinois securities law was designed to protect, someone that is not sophisticated, that doesn't have the choice on how to make decisions, that doesn't have the ability to find out just what's going on in the case. I think that's ultimately the difference here. He participated in this case. The securities law is a shield for the innocent, I think is what the case law says, not a sword for the businessman who makes an investment and then feels it's a poor choice. But ultimately, if we're going to come down to the securities issue, then there are other factors we have to look at, notably the statute of limitations, which is going to be expired on securities in this case. I think, truthfully, in ruling on this case, the trial judge did an excellent service for the plaintiff by not ruling on dismissing those claims. I mean, instead, he's giving him a chance to have it arbitrated and have a decision come down. Well, would fraud trump the statute of limitations? Potentially, but his overt knowledge in 2010 in signing PIM 2, which, by the way, also contains a provision that states, shortly before his signature, in fact, that these are not securities and these will not be registered as securities. So I think at the time you sign that document, especially given that the affidavit's on file, that our uncontroverted statement he did so in the presence of an attorney, I think that construes actual knowledge. So I think just in looking at that, what we're dealing with here is a one-page order that is filed by the judge, which is common in trial courts, a lengthy argument, briefing back and forth, cross motions. In the case of Zemeckis, what we come down to is whether or not this case should be arbitrated. And so then the argument then becomes, he has actual notice of PIM 2. The arbitration clause there is unequivocally valid. Florida is the proper forum because, as we stated, we're dealing with Florida LLCs, we're dealing with Florida properties. So then the court must decide, do the circumstances lead to the point where PIM 1 also goes to arbitration? And I think it's nonsensical to just arbitrate PIM 2 and leave PIM 1. We're dealing with the same set of circumstances, the same cast of characters. But ultimately, the trial judge, based on the evidence he had in front of him, I think made the right choice. I don't want to waste your time. If you have any additional questions, please let me know. No, we like people who sit down. You don't have to use all your time. It's okay. No, I don't think so. Thank you. If you have something more to say, just start.  I think that's it. Thank you very much. Thank you. Your Honor, I'd like to address the last statement first. It's nonsensical to arbitrate PIM 2 and not PIM 1. That's what this whole argument is about. I'm going to try a collateral jurisdiction in arbitration over PIM 1 by this nonsensical argument that because he should have known what should have been in the doctrines, he therefore is subject to arbitration for PIM 1. That's not the law. It never has been, and I highly doubt that it ever will be. And I would certainly hope that you would not endorse it. When he talks about PIM 2 being, quote, substantially the same as PIM 1, and he talks about we've submitted affidavits saying that LACOE received these things. Well, I can't take the depositions. Guess what? Nobody would allow me to do that. They found me tooth and nail. We in the election, we did not receive these. You tried to take the depositions of? Nassar and Gurabuti. The Afghans? Yes. And you were not allowed to do that? They refused to produce them. What did the court say? Wait until I make an order on this. And that order said you're going to arbitration. I had no such deposition out at the time we made that order. So it's kind of hard for me to fight affidavits when I can't even conduct discovery work. You know, my client says he didn't have it. I believe him. And we decided to verify a complaint. Most fascinating about it is what exactly did they give my client at that election meeting? And if they had an operating agreement all ready to go with his name on it, then why did it take him two years to then create one with his name on it? It makes no sense. You know, this is a deal where these people came to my client and they sold him, quote, an interest in a company. They may have used the words LLC. They may have called it a membership. But it was clearly an investment, a security for Dr. Laco. And he gave them his money. He trusted him. And their response is, well, if he's stupid enough to give me a check for $100,000 without getting the documents, then he deserves what he gets. And that's not the purpose of the Illinois Securities Law. You know, God bless doctors. I represent them all the time in medical malpractice. They're wonderful people. They're very hardworking people. They know more about the human body than I ever will. But in my experience, they're horrible business people. Absolutely horrible business people. And Dr. Laco made the mistake of trusting some other individuals who bamboozled him. And their response is, not only am I done defrauding you in the state of Illinois, but I'm going to make you go all the way to Florida to prosecute your claim under Illinois law that I did. And to me, this court should not sanction it because, quite frankly, if I'm out there and I want to figure out how to commit fraud, I'm going to use this case to do that. I appreciate your time. Thank you. Thank you very much. Gentlemen, this case will be taken under advisement and an order will be issued in due course. Thank you for your arguments today. The court will be in a short recess. All rise.